**Leland PATZNER, Plaintiff,**

v.

**Joyce BURKETT a/k/a Joyce McLaughlin, Deborah Myerchin and Stutsman County, North Dakota, a political subdivision, Defendants.**

**Civ. No. A3–84–105.**

United States District Court,
D. North Dakota,
Southeastern Division.

March 5, 1985.

James A. Wright, Hjellum, Weiss, Nerison, Jukkala, Wright & Paulson, Jamestown, N.D., for plaintiff.

Paul Grinnell, Gunhus, Grinnell, Klinger, Swenson & Bye, Moorhead, Minn., for defendants.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Defendants in the above-entitled action have moved for partial or complete summary judgment dismissing Plaintiff's claims

that Defendants Joyce Burkett and Deborah Myerchin made an illegal home arrest without consent or probable cause, violated Plaintiff's rights by using excessive force, and violated Plaintiff's rights against cruel and unusual punishment. Defendants further move the court for dismissal of all claims against Defendant Stutsman County, on the basis there is no vicarious liability under 42 U.S.C. § 1983, or in the alternative for dismissal of punitive damage claims against the County.

Plaintiff has opposed Defendants' motion for summary judgment. In addition, Plaintiff has moved for partial summary judgment on the issue of the legality of the home entry and arrest for driving under the influence (D.U.I.).

### FACTS

On April 17, 1983, sometime between 1:30 and 2:50 a.m., Plaintiff Leland Patzner drove his custom built passenger van off a road, through a ditch, and up onto a paved county road. In doing so, his van struck a car driven by his ex-sister-in-law, Pam Marsolek, which was travelling on the paved road. Marsolek's car was forced off the road into a ditch.

Patzner stopped near Marsolek's car, spoke with her, and offered her some money. There was a dispute between Patzner and Marsolek as to the amount of money Patzner would pay her. Patzner then informed Marsolek that if she was going to call the police he would be at home. Patzner left the scene of the accident and went immediately to his residence, which was located about three to four city blocks from the accident scene.

Pam Marsolek immediately contacted the Stutsman County Sheriff's Department, and Deputy Joyce Burkett and Special Deputy Deborah Myerchin were dispatched to the accident scene. Joyce Burkett is a 25-year old female deputy sheriff employed by Stutsman County. Deborah Myerchin is a 24-year old female who was participating in the volunteer special deputy ride along program for Stutsman County. Deborah Myerchin, as a special deputy, was required to periodically ride along with full deputies, to observe and gain experiences for her training. The full deputy was responsible for the patrol unit and was the supervisor of the special deputy. Deborah Myerchin was wearing a uniform and badge, but did not have a handgun or a night stick.

Defendants Burkett and Myerchin drove 15 to 20 miles south from Jamestown, North Dakota, to the accident scene near Ypsilanti, North Dakota. They inspected the scene and Marsolek's vehicle and interviewed Marsolek and her passengers. Marsolek informed Burkett and Myerchin of Patzner's offer of money to Marsolek, and that Patzner had been drinking and appeared to be intoxicated. Burkett and Myerchin immediately drove to Patzner's house.

Burkett inspected the damage to Patzner's van, which was parked outside Patzner's house. She observed a man, later identified as Lester Naatus, inside the van removing something, which Burkett believed to be beer. Burkett asked Naatus if Patzner was home, and he responded in the affirmative. Burkett asked if she could talk with him. Naatus said he would get him and went into the house. Burkett waited outside and returned to the squad car.

Burkett then went to the front door of Patzner's house. The screen door was open, and Burkett asked. Naatus if she could speak with Patzner. Naatus walked back to the kitchen and found Patzner fixing something to eat on the stove. Patzner told Naatus to tell the deputy he was in the kitchen eating. Naatus walked back by the door and told Burkett that Patzner was in the kitchen eating. Naatus then sat down on the couch and Burkett walked through the living room into the kitchen.

Patzner admits that if the officers would have waited until he came out to the living room, he would have asked them in.

Deputy Burkett informed Patzner he was under arrest, and Patzner replied he was not going with her. Burkett, in an attempt to take Patzner into physical custody,

pulled Patzner from his chair, which was at a height of 12 to 18 inches off the floor.

Patzner had both of his legs amputated as the result of a war injury. He weighs over 175 pounds without his prosthetic legs, and he refused to go with Burkett voluntarily. Burkett dragged Patzner into the living room, where Patzner told Burkett that he would go with her. Patzner did not physically cooperate, however, or tell Burkett where his wheel chair or prosthetic legs were. At the time of his arrest, Patzner's prosthetic legs were in a bedroom in his home. The devices were not fitting him well, and he was waiting to go for a refitting. His wheelchair was in his living room, but Burkett and Myerchin did not know where the wheelchair was located. Patzner never made a request for it.

Burkett continued to drag Patzner another 15 feet to the front door, where they were met by Myerchin. Burkett then handcuffed Patzner and she and Myerchin attempted to carry him to the squad car. They carried and dragged Patzner to the squad car and placed him on the back seat.

Burkett drove Patzner directly to the Stutsman County jail, arriving at about 3:30 to 4:00 a.m. Patzner was dragged and carried up several stairs to the jail booking area, where he was placed on the floor. There were no chairs in the booking area due to the danger they present in the event a prisoner becomes violent. All prisoners are required to stand or sit on the floor or stairs.

While Patzner was being transported to the jail he was asked if he would take a blood test for alcohol. Patzner told Burkett and Myerchin he would not take the blood test until he talked to his lawyer. Patzner was booked with D.U.I. and held for detoxification. He immediately called his lawyer, who arrived at 4:40 a.m.

The jailer took a mattress from a cell bunk and laid it on the floor for Patzner. Patzner was held in the jail overnight until 4:00 p.m. on Sunday, April 17, when he was released.

Patzner did not receive any medical treatment nor has he made any claim for personal injuries.[1] He has made no claim for lost wages or psychological injury.

Patzner was charged with D.U.I. and prosecuted in Stutsman County Court before the Honorable Harold B. Herseth. Patzner moved to suppress evidence and for dismissal of the charges on the basis that his arrest was illegal. Following the evidentiary hearing in the County Court, the court ruled there was no question there was probable cause to make an arrest and that Burkett thought she had consent to enter Patzner's home, but in fact, there was no consent. The court noted while there was no authority presented to show an officer could enter someone's home to make a warrantless arrest for a misdemeanor, there was no authority submitted by Patzner that flatly stated the opposite. The court concluded that because the prosecution could not present any authority in support of its position, a warrantless arrest could not be made under the circumstances. The court suppressed all evidence received as a result of the entry into Patzner's house and the State's Attorney dismissed the D.U.I. charges against Patzner.

## DISCUSSION

Plaintiff brought this action under 42 U.S.C. § 1983 alleging four specific rights violations: (1) arrest without probable cause; (2) warrantless and nonconsentual entry into Plaintiff's house to perfect an arrest; (3) excessive use of force; and (4) cruel and unusual punishment.

■ The qualified immunity defense is available to government officials performing discretionary functions. Qualified immunity shields officials from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2737–2739, 73 L.Ed.2d 396 (1982).

## A. Probable Cause to Arrest

 In Patzner's criminal case on the D.U.I. offense, the state court, in ruling on Plaintiff's motion to suppress and dismiss, specifically held there was probable cause for Patzner's arrest on the D.U.I. offense. The state court's finding of probable cause is binding for purposes of this civil rights action under section 1983. Principles of res judicata and collateral estoppel are fully applicable to civil rights actions brought under section 1983. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Therefore, Plaintiff's claim the arrest was without probable cause cannot be relitigated and fails.

## B. Warrantless and Nonconsentual Entry Into Plaintiff's House to Effect an Arrest

Defendants are shielded from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396. The state court judge found that Burkett thought she had been given consent to enter Patzner's house, but in fact, consent had not been given. The state court judge did not address the pertinent issue here, however, whether Burkett was violating clearly established statutory or constitutional rights of which a reasonable person should have known.

Under section 29–06–15 of the North Dakota Century Code a peace officer, without a warrant, may arrest a person on a charge, made upon reasonable cause, of driving or being in actual physical control of a vehicle while under the influence of alcoholic beverages. In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Court held a warrantless home arrest could not be made for a felony violation upon a showing of probable cause and absent exigent circumstances.

In May 1984, subsequent to the April 1983 incident in this case, the United States Supreme Court decided *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), holding that a warrantless night time entry into the petitioner's home to arrest him for a civil nonjailable traffic offense was prohibited by the fourth amendment. The petitioner was arrested for driving under the influence of an intoxicant, in violation of a Wisconsin statute which provided that a first offense was a noncriminal violation subject to a civil forfeiture proceeding for a maximum fine of $200. The Court held before government agents may invade the sanctity of the home, the government must demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. An important factor the Court considered in determining whether an exigency existed was the gravity of the underlying offense for which the arrest was made. The Court held the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe only a minor offense has been committed. 104 S.Ct. at 2099.

The Court limited its holding to the facts of the case, in which the offense of driving while intoxicated was classified as a noncriminal, civil forfeiture offense for which no imprisonment was possible. *Id.* at 2100. The classification and penalty for the offense were said to be the best indication of the state's interest in precipitating an arrest, and they could be easily identified by both the courts and the officers faced with a decision to arrest. *Id.* The Court specifically left open the issue of whether the fourth amendment may impose an absolute ban on warrantless home arrests for certain minor offenses. *Id.* at 2097 n. 11. Since the State of Wisconsin did not have a strong interest in arresting individuals suspected of committing D.U.I. offenses, as shown by the classification of the offense by the State, the Court did not reach the issue of whether the need to ascertain petitioner's blood-alcohol level supported a finding of exigent circumstances. *Id.* at 2099–2100.

Defendant Burkett argues the *Welsh* case illustrates how unclear the status of the law applicable to the facts of the present case is. The North Dakota D.U.I. charge does not constitute a felony, but it does provide for a confinement sentence. N.D.Cent.Code § 39–08–01 (1979). The State of North Dakota has a greater interest than the State of Wisconsin has in the arrest of persons suspected of committing D.U.I. offenses; and the ruling in the *Welsh* case is not controlling.

■ Plaintiff moves this court to make a finding that the arrest in this case was illegal under the *Welsh* case. The relevant issue in this case, however, is whether Defendants violated clearly established statutory or constitutional rights of which a reasonable person should have known. The *Welsh* court noted that most lower federal and state courts have refused to permit warrantless home arrests for nonfelonious crimes, but specifically left the issue open. 104 S.Ct. at 2097, 2099. Therefore, the legality of a warrantless home arrest for D.U.I. in this case is not clearly established, and a reasonable person would not have known the legality of such an arrest. Therefore, qualified immunity applies to shield the defendants from liability for the warrantless home arrest of Plaintiff.

### C. Excessive Force

The court of appeals in *Bauer v. Norris*, 713 F.2d 408 (8th Cir.1983), discussed the principles to guide the court's consideration of the use of force by a law enforcement officer. 713 F.2d at 412. The court stated:

[A] court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* Plaintiff may recover on his civil rights claim relating to Defendants' use of force if: (1) Defendants used more force than a reasonable person would have used in the circumstances; or (2) if the force was used for an improper purpose. *Id.*

In the *Bauer* case the Eighth Circuit noted there was virtually no evidence the plaintiffs actually physically resisted or physically threatened the law enforcement officers at the time of the arrests. Verbal abuse alone does not justify the use of any force, and force can only be used to overcome physical resistance or threatened force. *Id.* at 413.

In the present case Patzner admits when Burkett tried to arrest him he told Burkett he wasn't going with her. Burkett then tried to carry or drag Patzner. When Burkett had dragged Patzner about halfway out to the living room, Patzner told Burkett he'd go with her, but he made no attempt to cooperate physically and he did not tell Burkett where his wheel chair or prosthetic legs were. Burkett then handcuffed Patzner, and Burkett and Myerchin attempted to carry Patzner to the squad car to the extent of their abilities.

■ Patzner's claim for excessive use of force is based on his allegations that two female officers were not able to transport Patzner's weight of approximately 175 pounds from his house to the squad car and from the squad car to the jail booking desk. The force applied was minor, and the actions of Defendants in attempting to move Patzner, who initially refused to come with them and did not cooperate by telling the deputies where his wheelchair or prosthetic legs were, were not unreasonable as a matter of law. The deputies in a rural area did what they could under the circumstances, and their actions do not rise to the level of a constitutional violation.

### D. Cruel and Unusual Punishment

■ Plaintiff contends he was confined for 15 hours to a hard mattress on the floor of a jail cell and was not given the opportunity for release. The critical inquiry is "whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional

sense of that word." *Davis v. Smith*, 638 F.2d 66, 68 (8th Cir.1981), quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). In *Davis*, after a nonjury trial, the district court held conditions in the cell constituted cruel and unusual punishment in violation of the eighth amendment. 638 F.2d at 68. The Eighth Circuit stated this finding was clearly sufficient to establish a violation of Davis' due process rights under the fourteenth amendment. *Id.* (16 days imprisonment in 6 by 10 foot concrete cell with up to six prisoners; no mattresses, blankets, or pillows; hole in the floor for a toilet; no personal hygiene articles; no wash basin or running water; unheated cell in which prisoners slept huddled together for warmth on steel bunk or concrete floor).

■ The treatment of Plaintiff in this case does not reach the level of a constitutional violation. Further, if Plaintiff had a constitutional right to some other type of bedding arrangement, the officers were not aware of such right and are immune under the *Harlow* objective test. *See Ford v. Board of Managers of New Jersey State Prison*, 407 F.2d 937 (3d Cir.1969) (no cause of action for cruel and unusual punishment, one of the allegations was that an old mattress with a clean cover on a cement shelf was provided for bedding); *Carlisle v. Bensinger*, 355 F.Supp. 1359 (N.D. Ill.1973) (no cause of action for cruel and unusual punishment; one of allegations was that prisoner was required to sleep on a 2½ inch deep mattress placed on the floor).

### E. Liability of Stutsman County

Even though complete summary judgment in favor of Defendants Burkett and Myerchin is appropriate, and thus summary judgment in favor of Defendant Stutsman County is appropriate, the theories of liability alleged against the County will be discussed briefly. Plaintiff alleged Stutsman County is responsible for the policies, procedures, and practices implemented through its agents and employees of the Stutsman County Sheriff's Department and

for injuries occasioned thereby. Plaintiff further alleges that the County was grossly negligent in conducting training and supervising of Burkett and Myerchin. Plaintiff alleges Stutsman County had notice that Burkett was not properly qualified to make a legal arrest based on her past performance.

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court held that a political subdivision cannot be held liable under section 1983 solely because it employs a tortfeasor, and the conduct of the city must have caused the constitutional violation. A political subdivision can, however, be held liable when execution of a government's policy or custom, whether by its lawmakers or by those whose acts may fairly be said to represent official policy, inflicts the injury. 436 U.S. at 694, 98 S.Ct. at 2037; *See Williams v. Butler*, 746 F.2d 431, 438 (8th Cir.1984).

■ Negligent failure to supervise, control, or train the offending individual officers is not actionable absent a showing that the County either encouraged the alleged specific incident of misconduct or in some other way directly participated in it. At a minimum Plaintiff must show the County at least implicitly authorized, approved, or knowingly acquiesced in the alleged unconstitutional conduct. *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Wing v. Britton*, 748 F.2d 494, 498 (8th Cir.1984). When the constitutional violation is not alleged to be part of a pattern of past misconduct, a supervisory official or municipality may be held liable only when there is essentially a complete failure to train the police force, or training is so reckless or grossly negligent that future police misconduct is almost inevitable. 668 F.2d at 874.

■ Plaintiff has not suggested facts exist to show the County had prior knowledge of Defendants' propensity for improper conduct. In addition, Plaintiff has not

**1146**

shown that a policy of the County caused the alleged violations in this case, or that there was a total lack of or gross negligence in training and supervision, as required for section 1983 liability.

The punitive damage claim against the County is also improper, as the Supreme Court has held municipalities are immune from punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). An award of punitive damages would have little deterrent value and would create a risk to the financial integrity of governmental entities. *Id.*

No genuine issue exists as to any material facts.

IT IS ORDERED judgment be entered for dismissal of Plaintiff's complaint and cause of action against all Defendants.

IT IS FURTHER ORDERED Defendants' motions to compel Plaintiff to answer interrogatories and to exclude photographs are moot.